HÉCTOR MARTÍNEZ, Plaintiff and Appellee, *v.* DR. FRANCISCO LLAVAT ET AL., Defendants and Appellants.

No. 12747. Decided October 18, 1962.

224

José E. Sabater for appellants. E. Alcaraz Casablanca for appellee.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

Appeal was taken from a judgment rendered by the Mayagüez Part of the Superior Court allowing damages, based on the following facts which are unquestionably supported by the record:

In January 1957 plaintiff occupied certain business premises under a month-to-month verbal agreement in a building owned by defendants, situated at the corner of Libertad and Muñoz Rivera Streets of Mayagüez. Until November 1956 he had paid $60 rent, but by order of the Economic Stabilization Office the rent was reduced to $38.70 a month.[1]

On January 24, 1957 the lessor made written demand to plaintiff through his attorney to vacate the premises within a period of six months, alleging that the building was badly in need of repairs and that he had decided to demolish it in order to reconstruct and use it as a warehouse, and that the demand was based on subd. 8, § 12 of the Reasonable Rents Act, No. 464 of 1946 (Sess. Laws, p. 1326). That as a result of the reconstruction the premises would be larger, which was necessary for his own interests. Plaintiff was advised that if he did not move within the period of six months the corresponding unlawful detainer proceeding would be filed. As a result of that demand, plaintiff vacated in the latter part of February 1957 and moved the business to other premises for which he paid a rent of $75 a month.[2] The work to be performed, as concluded by the trial court and shown by the record, consisted in eliminating two interior brick walls, repairing the roofs, laying of tiles on the

---

[1] Plaintiff testified that when he paid this rent the lessor told him that he was not agreeable to reducing the rent on the house and that what he had to do was to move immediately.

[2] The record shows that a few days after demand was made the lessor and an engineer went to make a survey, and plaintiff was led to believe that the works would commence soon. Plaintiff hastened to look for other premises because he had a large stock of merchandise.

concrete floor, the elimination of a worn-out eave projecting over the sidewalk, and substituting the same by a main door and two show windows, one in either side, instead of the existing three-door facade. The exterior walls would not be demolished nor altered. The building was divided into three commercial premises. As a result of the reconstruction there would be only one premises covering the entire floor. The corresponding plan is dated February 17, 1957.

The building was vacated in February 1957. On May 3, in view of the fact that more than two months had elapsed since the building was vacated without the works having been started, plaintiff requested the lessor in writing to release the premises which he had occupied, which request was not answered. Prior to that time, on March 4, plaintiff had asked the lessor in writing to inform him when the repairs would be terminated, inasmuch as he wanted to obtain his former premises because in the new ones he was sustaining losses in his business. To this letter the attorney for the lessor answered on March 6 that "that part of the law which previously permitted the reoccupation of the premises or part thereof has been repealed and declared unconstitutional, first, by judgment of the Circuit Court of Boston, and, second, by confirmation by this Supreme Court", and advised him to take notice of that situation and to remain in the premises to which he had moved or to look for a better place which would suit his interests. Around that time, in May 1957, the lessor rented part of the vacant building to another tenant who paid offhand for the repairs made in the portion of the building rented to him. One year later, at the time the trial of this case was being held in the trial court, no work had been performed in the remainder of the building.

The reason alleged by the lessor at the trial for not performing the work was the lack of funds, stating that since the property had been inherited by his wife and the inher-

itance tax had not been paid, he had been unable to raise the necessary funds. On this matter the evidence in the record shows that defendant Mariana Cristy had been declared on June 21, 1955 sole heir of her mother; that the declaration of inheritance was untimely filed and the tax was paid in April 1958, and the property was recorded on May 2 of that year. The lessor testified that they owned a great number of other properties, which exceeded twenty, many of which were free from encumbrances.[3]

The trial court concluded that as a result of having to vacate the premises situated in front of the market place of Mayagüez and equip new premises, plaintiff had incurred the following extraordinary expenses: (1) cost of moving, $35; (2) awning to protect the windows, $100; (3) electric

---

[3] Upon questioning by plaintiff, the lessor's testimony in court was also in part as follows:

"Doctor, could you explain why, when plaintiff Martínez made demand to you to return the premises to him, if you were not going to repair them, you would not answer? That is a question for my attorney, because I handed the letter to my attorney .... — From the moment he brought up this question and when you asked him to vacate the premises, when in March and in May he wrote to you, did you know that you could not repair the premises? I did not know because I depended on the Government of Puerto Rico so he would vacate the property and I could repair it. —Why did you depend on that? In order to raise funds to repair it.—Could you not raise funds by any other means? By no other means, because I was not going to encumber other property.—The trouble is you did not want to do it that way? That is my policy... — How is it that after May 1957 you leased it to Pedro Javier Boscio? The building, part of it was reconstructed....—Did you not say that the repairs were made by Pedro Javier Boscio? Yes, he paid for them in accordance with the contract.—Was it already leased to him? No, sir. The lease contract was made in order that he could pay for them... — Yet, when plaintiff Martínez demanded that you return the premises to him, you did not even answer. I did not have to answer.—Did you not want him there even if he was willing to repair it? Well, the fact is that he never made any propositions to repair the building...—Doctor, how are you going to demolish all those partitions with Pedro Javier Boscio in there? Javier Boscio has nothing to do with it.—Is it shown differently in this drawing? Yes, sir, because that was preliminary. The only thing that has to be demolished is this here.—Are these drawings the way they are going to be made now? Have they been

installation, $56.14; (4) advertising bills, $25; (5) miscellaneous expenses, $156; (6) rent increase, $544.50.[4] In addition to those items amounting to $916.64, the trial court determined that as a result of the change of premises the business had wained and that plaintiff also suffered the natural anguish, and allowed for that account an additional indemnity of $1,000.[5]

The trial court concluded at law that the statutory indemnity provided by subd. 8(e) of § 12-A of Act No. 464 was not applicable because the premises were not returned to plaintiff; and that since defendants had acted unlawfully and maliciously, they were liable to plaintiff for all damages caused pursuant to § 1802 of the Civil Code.

changed? No, because part was already constructed....—When in January 1957 you asked Martínez to move, you did not know yet when you were going to receive that? No. If I had known it I would have paid for it immediately and would have reconstructed the premises. I could have raised funds at that time to reconstruct the premises.

. . . . . . . . .

THE COURT: What are your present plans for this work? To reconstruct immediately because I have made arrangements already with the bank which is going to lend me the money.

. . . . . . . . .

[Plaintiff] Are they going to give you the money secured by this property before reconstructing it? You know that nowadays building loans are made for reconstruction. Within that plan they are going to give me the money to reconstruct it. However, if Mr. Martínez is willing to do the same business as Pedro Javier Boscio, I shall be delighted.

[Plaintiff] He can not. As a matter of fact, when you asked him to move he demanded that you return the premises to him, were you in no condition to repair the same? No, sir, no, because we had not been informed about the inheritance....—So, you were ready to commence the repairs when the inscription was made in the registry on April 29, 1958? Exactly.—You were ready by that time? When I payed on May 31, 1958, yes, sir."

[4] The trial court computed the rent increase on the basis of the difference between the $38.70 rent which he would have paid for the old premises and the $75 rent for the new premises during a 15-month period until plaintiff transferred the business to his mother.

[5] Plaintiff testified, without being contradicted, that his business in front of the market place was mainly the sale of a certain kind of clothing to country people who came to the market. The new premises were not much frequented and his business was a losing proposition.

In this appeal defendants assign as errors committed by the trial court: (1) the failure to decide that the limitation imposed to the lessor by means of the present action is unconstitutional; (2) the failure to declare that the Reasonable Rents Act is unconstitutional due to the nonexistence of a state of war; (3) the failure to accept that the measure of indemnity in this case, if any, is fixed by law; (4) the imposition on defendants of an indemnity in general terms when the law does not permit a different indemnity; and (5) the imposition of an indemnity on defendants who had acted in good faith and were unable to defray the expenses of reconstruction because they were precluded by the inheritance-tax law.

Let us consider the applicable law. Sections 12 and 12-A of the Reasonable Rents Act, No. 464 of April 25, 1946, 17 L.P.R.A. §§ 192, 193 (1961 ed.), provide that regardless of the date of construction or occupancy of both dwellings and business premises . . . the lease contract shall, on the day of expiration agreed upon therein, be compulsorily extended by the lessor at the option of the tenant or lessee, without altering any of the clauses . . . As exceptions to the foregoing, the lessor may refuse the extension of the lease contract and, consequently, commence unlawful detainer proceedings in the following cases [Section 12-A] :

"   .            .            .            .            .

8. Whenever the lessor is planning to demolish in whole or in part the leased building, in order to construct a new building. The following requisites shall concur:

a. That it is impossible, because of the nature of said works, to carry out same while the tenant is still occupying the house.

.  .        .            .            .            .            .

c. That the plans for the new construction have been approved by the proper authorities and the building permit has been granted.

d. That at least six months prior to the date on which the works are intended to be started, the lessor shall give the affected tenant authentic written notice to vacate the premises on account of the works to be carried out."

Subdivision 8 of § 12-A provides in par. (e) that within two months counted from the day when the property is entirely vacated, the demolition and construction works shall be started. Upon the expiration of this term, if the works have not been started, all the tenants may return to the property without obligation to pay rent for the months elapsed, and shall be entitled to an indemnification by the lessor equivalent to six months' rent, provided they stay there for a minimum period of one year.

Paragraph (f) of subd. 8 provides that the lessor may retain for his own use in the reconstructed property not more than one business premises, and the other premises available shall be leased, in the order of seniority, to the lessees ejected from their former premises who may desire to return to the property.[6] In this connection, the following par. (g) provides that before vacating the property the tenants protected by the provisions of par. (f) shall sign proper documents with the lessor stating the area, exact location within the property, rent, service, and equipment both of the premises which they occupied before the ejectment and of those which they will occupy in the reconstructed building, and that said documents shall make reference to the plans and papers made for the new building and shall be attached thereto upon submission thereof to the authority which must approve them, with whom they shall remain filed as official evidence.

In connection with subd. 8(e) of § 12-A, it is provided by § 12-J which was added to the Reasonable Rents Act by Act No. 201 of May 14, 1948 (Sess. Laws, p. 574), that any

---

[6] The record does not show that the lessor in this case desired the entire building or any premises for himself. It shows otherwise.

lessor who causes a tenant *to vacate* a dwelling or business premises through judicial proceedings *or otherwise,* through deceit, threat, or violence, *or notice of any judicial action...* or who, *without just cause,* fails to begin the works referred to in paragraph 8 (*d*) of Section 12-A, within two months after the property is vacated, ... shall be guilty of a misdemeanor and, upon conviction shall be punished by a fine of not less, etc.

The fundamental issue in this case is whether or not, in view of the facts in the record and of the Reasonable Rents Act, indemnity of a general type such as that herein provided should be allowed in law. The problem transpired, although it was not decided, in *Pagán* v. *Caballero,* 68 P.R.R. 274 (1948), a decision of practically historical value at the present time, although in a certain sense it bears on the question in litigation. It dealt, as here, with a general action for damages. The tenant vacated a dwelling upon demand by the lessor who alleged that he needed the same to use it as his residence. He never established his residence there, but sold the property. Recovery of damages was sought on the ground that the lessor defeated tenant's right to continue occupying the leased property. We held that during the period therein involved the federal rent legislation inhibited local rent control, and that under that legislation, which was the only one applicable, no damages for eviction on false grounds were allowed. The action was dismissed.

However, considering that as of July 1, 1947 the federal legislation did not inhibit local rent control, we called attention to the fact that the former § 12 (*f*) of Act No. 464 provided for damage suit by a tenant under certain circumstances.[7] And we then said that, assuming that § 12 (*f*) is

---

[7] The former § 12 (*f*), as amended by Act No. 36 of July 22, 1947, provided that the landlord who *obtained an ejectment* under the allegation that he sought the possession of the leased property to establish therein his residence, for the purpose of defeating the right of the tenant to con-

valid, a tenant had a cause of action if a landlord wrongfully *ousted* a tenant by means of judicial proceedings. A tenant who vacated prior to but under threat of an unlawful detainer suit based on false grounds would be forced to sue only under § 1802 of the Civil Code, *which may or may not provide* for such a cause of action. And that in view of the uncertainty as to the applicability of § 1802, the Legislature, which is presently in session, may wish to settle the question by broadening the terms of § 12(*f*) to include not only tenants who are evicted by judicial action but also tenants who vacate under threat of a judicial proceeding.

■ Section 12(*f*), as it stood, disappeared. However, in § 12-J, which was added later, the Legislature gave heed in part to the suggestion by punishing the landlord who caused the tenant to vacate by means of judicial proceedings *or otherwise*, under deceit, threat, or violence, *or notice of any judicial action*. The other aspect of the problem still exists. On the contrary, § 12-J does not mention the indemnity for damages provided in the former § 12(*f*), although limited to $100 or three months' rent. It is necessary to resort to the general principles.

■ Weighing the evidence in the record favorably to defendants, we part from the basis and assume that the purpose sought in this case was to demolish, in whole or in part, the leased building in order to construct a new one, or reconstruct the same, to which reference is made in subd. (8) of § 12-A. *Cf. Rodríguez* v. *District Court*, 69 P.R.R. 505; *Rivera* v. *Cobián Chinea & Co.*, 68 P.R.R. 531. Unlike the preceding subds. (6) and (7), in subd. (8) the lawmaker did not refer expressly to the element of good faith of the

---

tinue occupying the property, if he did not establish his residence in said property within the 30 days... or if he leased it to another.... shall be guilty of a misdemeanor... *provided that in any such case the affected tenant was entitled to an indemnity from the landlord for the damages caused him, which damages shall be fixed in an amount which in no case shall be less than $100 dollars or less than three times the amount of the monthly rent, whichever of these sums is the larger, plus the costs, etc.*

lessor in requiring the tenant to vacate. However, this element of good faith in the concept of the Reasonable Rents Act—to act "honestly, without fraud, collusion, or deceit," as stated in *Heirs of Pérez* v. *Gual*, 75 P.R.R. 361, 367, or in the equitable concept of justice, "the cleanliness of purpose which satisfies the moral conscience of the judge," stated later in *Roselló Hnos.* v. *Figueroa*, 78 P.R.R. 250, 258—is not lacking completely in subd. (8). It permeates throughout the different paragraphs from (a) to (h) of that subdivision.

Weighing the evidence in the record in the light of those considerations of law, it appears unquestionably that even though it were said that there was good faith on the part of the lessor in the plan to vacate, there was on his part an utter disregard of the provisions and requirements of subd. (8) in the different paragraphs applicable to the case, which defeated plaintiff's right to continue occupying the premises under the protection of such right afforded by a law which, for reasons of public policy, has made the tenant a ward of the State. The trial court concluded, and its conclusion is supported by the record, in the light of the requirements which must concur under subd. (8), that the lessor had no basis nor justification to require plaintiff to vacate, as he did. He was less justified and acted in contravention of law in disregarding plaintiff's demand for return of the premises upon failing to commence the work within two months. To that effect and for the purposes of § 12-J, the reasons adduced by the lessor for requiring the vacation do not constitute just cause. The trial court also concluded, correctly, that the indemnity provided in par. (*e*) of subd. (8) was not applicable to this case because the lessor did not return the premises upon tenant's demand. According to the text, the indemnity shall be allowed provided the tenant is permitted to return to the premises and stays there for a minimum period of one year.

■ In view of the facts in the record and of the provisions of § 12-J, the lessor was at fault. The special Rents Act contains certain concepts of statutory indemnity. Regarding subd. (8), mention is made only of the indemnity under par. (*e*), which we have said does not apply in this case. The question here is not the contractual fault or liability because, although the relations of the plaintiff and defendants arise originally from a lease contract, the acts which are prejudicial to plaintiff and which are the object of the action were not prejudicial as respects their noncompliance, but as respects culpable noncompliance with the provisions of the Rents Act which guarantee tenant's right.

■ On the other hand, the fact that the Reasonable Rents Act does not expressly provide indemnity for the lessor's culpable acts, does not mean, in the absence of provision to the contrary, that indemnity should not be allowed if the acts caused damage. Section 12 of the Civil Code (1930 ed.) provides that in matters which are the subject of special laws, any deficiency in such laws shall be supplied by the provisions of that Code. *Cf. Galiñanes Hnos.* v. *Sup. Ct.; Univ'l, Furniture, Int.*, 77 P.R.R. 836, 842; *Fuentes* v. *Sec. of the Treasury*, 85 P.R.R. 472 (1962); *Robles* v. *Superior Court*, 85 P.R.R. 640 (1962). Defendants are therefore bound to repair the damages caused to plaintiff by their culpable acts appearing from the record, pursuant to §§ 1042, 1045, and 1802 of the Civil Code.[8] *Cf.*

---

[8] *Sec. 1042.*—Obligations are created by law, by contracts, by quasi-contracts, and by illicit acts and omissions or by those in which *any kind of fault* or negligence occurs.

*Sec. 1045.*—Civil obligations, arising from crimes cr misdemeanors, shall be governed by the provisions of this Code.

*Sec. 1802.*—A person who by an act or omission causes damage to another when there is *fault* or negligence shall be obliged to repair the damage so done.

Section 2 of the Code of Civil Procedure (1933 ed.) provides that when the violation of a right admits of both a civil and criminal remedy, the right to prosecute the one is not merged in the other.

*Zalduondo* v. *Sánchez*, 15 P.R.R. 216; *Díaz* v. *San Juan Light & Transit Co.*, 17 P.R.R. 64; *Guzmán* v. *Vidal*, 19 P.R.R. 800; *Torres* v. *Heirs of Córdova*, 31 P.R.R. 849; *Mejías* v. *López*, 51 P.R.R. 20; *Reyes* v. *Aponte*, 60 P.R.R. 867; *Ramírez* v. *Morales*, 69 P.R.R. 656, 659; *Muriel* v. *Suazo*, 72 P.R.R. 348, 354; *Hernández* v. *Fournier*, 80 P.R.R. 94. See, by analogy, Judgments of the Supreme Court of Spain of October 14, 1944; January 27 and February 12, 1952; and October 20, 1954. In the latter, which set aside the judgment appealed from disallowing damages under § 1902 (our § 1802) as a result of foreclosure of property executed during the effectiveness of a moratorium decreed by the government, the Court said: ". . . yet, this reasoning is without basis since, if the plaintiff filed in the Court of First Instance, within the foreclosure proceeding brought in 1935, petitions seeking the auction of the attached properties, and since no bidders appeared at the sale the properties were adjudicated to him while the 1938 moratorium was in force, those petitions and orders implied a contravention of law, a violation of § 4 of the Civil Code, of evident public policy which, although it passed unnoticed to the Court of First Instance, does not imply, except for some other type of liability, the exoneration of plaintiff who was guilty at that time of instituting those actions. In fact, appellee herein openly violated a right instead of asserting the same thereby infringing the rights of the adverse party protected by the moratorium decreed in view of the general situation of Spain as a result of the War of Liberation, causing evident prejudice to appellant, and which, owing to the existence of the cause and effect relationship, call for proper and equitable reparation, and the determination of which shall be made upon execution of judgment."

The foregoing disposes of the third, fourth, and fifth assignments of error. The record supports the damages sustained by and allowed to plaintiff, with the excep-

tion of the items of $100 for an awning and $156 for miscellaneous expenses, which represent an investment in recoverable property. The grounds of the first and second errors do not merit serious consideration. We already said that the lessor at no time sought to recover the property for his own use or to withdraw the same from the rent market, nor had any interest in reserving any premises for himself after the reconstruction. *Cf. Hernández* v. *Superior Court,* 79 P.R.R. 451; *Mouriño* v. *Superior Court; Laboy, Int.,* 76 P.R.R. 256. Within the purposes pursued by the Reasonable Rents Act, par. (*e*) of subd. (8) is a valid regulation.

Regarding the contention that the Reasonable Rents Act is wholly unconstitutional since there is no longer a state of war, it is not proper to attribute such a narrow scope to its aims and purposes. Although there is not a state of hostilities, the lease relationship, like the enjoyment of any other property right, may be regulated by the State in the interest and welfare of the community. This regulation forms part already of a body of social law aimed at protecting the tenant, a juridically weaker party, and transcends mere temporary emergency situations. As stated by CASTÁN in his comments on the Declaration of Policy of the Spanish Urban Leases Act of 1946, this regulation is motivated by social-justice directives. I CASTÁN, *Tratado Práctico de Arrendamientos Urbanos* 72 *et seq.* (1956). Even though we consider it as a merely temporary emergency legislation, appellants have not incorporated in the record the elements of proof necessary to prove that such situation of public policy which justified its approval no longer exists.[9]

The judgment appealed from is modified deducting from the amount of indemnity the $100 and $156 items referred to and, as thus modified, it will be affirmed.

---

[9] *Cf. Chastleton Corp.* v. *Sinclair,* 264 U.S. 543; *Home Bldg. & Loan Assn.* v. *Blaisdell,* 290 U.S. 398; *Kress, Dunlap & Lane* v. *Downing,* 193 F. Supp. 874, 878; *Kress, Dunlap & Lane* v. *Downing,* 286 F.2d 212, 215.